Please the Court, Jeremy Brogy for Appellants Brake Plus and Williams and Lake. The District Court erred by holding that the adjudication letters that NHTSA issued to the companies lack legal consequence and therefore are not final agency action. The Pulse modules at issue in this case have been used for over 25 years by more than three million drivers to reduce rear-end collisions on our nation's highways. Two years ago, NHTSA issued the adjudication letters to the companies, wrongly claiming that the modules are illegal when installed by car dealerships. The agency's had the same opinion since the 1970s, hasn't it? And it's repeatedly issued, I don't know if they're letters or what. In other words, nothing changed. The agency's position has been the same since before I was born, I think. How can that be a final action when they've been consistent since the 1970s? Well, I don't think they've been consistent since the 1970s. If you look at the 1973 letter, which is a one-sentence response to a hypothetical question, they say that their interpretation of steady burning means it cannot vary widely. Isn't that essentially what they're relying on here, if you get to the merits of whether the devices are prohibited or not? Well, they've cited it here, but our contention is that we do not vary widely because we stay within the Candela range that's specified in the rule. So under the statute, under the safety... But they haven't changed their definition, have they? Well, they have. What they're saying now is inconsistent with what they've said at other times. Do you think it's inconsistent or it's elaborated on? It's inconsistent. They say, let me just read to you from the 1998 Goldstein letter. The steady burning standard does not prohibit changes in intensity, which we presume will be within the parameters of the minimum and maximum values of Candela specified. So it's inconsistent with the position that they're taking here. Have they ever threatened enforcement this way for years? I don't think so, Your Honor. Does the record reflect that they've ever sent the letters demanding, previously, demanding the list of customers and actually preparing letters? We've never seen anything like that. There's nothing like that in the record except that's to our clients. In fact, the letters that they sent, I mean, our contention is that they're classic final agency action. These letters judge the company's products illegal when installed by car dealerships. They demand the companies immediately turn over their customer lists and modify the content of their websites. And they commit nitsa to telling the company's customers about its wrong legal conclusion that the Pulse module is unlawful when they install it. I guess I'm a little confused. Are we dealing with one agency action here or are we dealing with more than one? I mean, we have a letter, right? But the letter purports to do more than one thing or demands more than one thing, right? It sets out kind of the agency's legal position. It demands customer information, which I understand has been provided but not used. And then it indicates that the agency is going to contact customers, right? When we're analyzing whether this is final agency action, does all that go together? Or do we look at those sorts of independent aspects of what the agency is doing separately? Well, I think each of those can get you there independently. But you do look at the action as a whole. And the first one that it does, the first one that you mentioned, was that it takes law and it applies it to fact. So unlike some of the letters they've issued in the past where they've stated their position in the abstract, here they've said your product is illegal when it's installed by car dealerships based on how our product operates. That type of declaratory ruling is a classic adjudication. So they've also asked for information, and I understand your clients have provided that information. Is that correct? That's right. But they haven't taken the last step, which would be to contact your customers. That's right. Okay. And we don't think they need to for this to be final. When you read the district court's opinion, he seemed to be reviewing whether the action that hasn't happened yet is final, those forthcoming letters. But the adjudications that were challenging from two years ago, those are final now because they make a declaration about the legality of our product. And I just want to read you a couple statements from those letters. Pulse takes required stop lamps on motor vehicles out of compliance with federal law. That's at addendum 14. The brake plus module cannot be installed for its intended use on motor vehicles consistent with federal law. That's at addendum 17. They also say the brake plus module cannot be installed for its intended use on motor vehicles consistent with federal law. Pulse takes required stop lamps on motor vehicles out of compliance with federal law. These are definitive, unequivocal statements. They're entirely unlike the ones in the letters that the agency points at to argue that this is non-final. In fact, we think this case is a lot like the frack case that this court issued last year, which involved PowerPoint slides that identified specific products and said these products have to be registered under a federal statute. This court said that's final agency action because it applies law to fact. In addition, the customer list that you mentioned, Judge Cobes, those are also final. That's also final in the sense that the letters are asking or demanding that those be turned over. When the government says you have to do something now, that's final action. We think that makes the letters final as well. Then the commitment to tell our customers about NHTSA's view of our products, that also makes the letters final. The adjudications say that NHTSA intends to send letters to and then names the companies in each letter, purchasers to inform them of the prohibition. NHTSA's counsel stated at the hearing below that the letters have already been drafted. We don't know why they haven't sent them, but they've told us that they plan to, which is why we're here. In addition to finality, because the district court erred on the final agency action, it failed to reach the merits. This court has authority to direct the district court to enter an injunction. That's the Catoa case that we cite in the papers. Based on the equities, we think you should. The adjudications are wrong on the merits for two reasons. They misinterpret the regulation and the statute, and they are arbitrary and capricious. Contrary to the adjudication, lamps operated by the pulse modules are steady burning because they stay within the photometric limits and do not flash. As I mentioned a moment ago in response to your question, the Safety Act says that federal motor vehicle safety standards must be stated in measurable, objective terms. Standard 108 does not define steady burning, but its meaning is clear from the text and the structure of the rule. Counsel, in the last 10, 15 years, we've said several times the common approach, whatever that means, is to remand for full analysis, and this court should not be issuing preliminary injunctions. Do you have any case in that period of time that goes against the, quote, common approach? You may know common approaches in several of our cases, including some very recent cases, I might add. I think the most recent case we have where this court has done that is the 1995 Catoa case that we cite in the papers. Okay. Sure. Thank you. And I would just say, too, if the government was agreeing to hold the letters until the litigation was over, we'd be completely happy. You're aware in the Catoa case that the district court twice refused to do a preliminary injunction, right?  Yeah, so it was the third strike, so to speak. Proceed. Returning to the merits, we contend the meaning of the rule is clear from its text and structure because it has to be objective. Standard 108 says a high-mounted stop lamp must be designed to conform to the photometry requirements of Table 15. That table specifies that a high-mounted stop lamp must stay between 125 and 160 candela. That is an objective standard that satisfies the statute because it's measurable. And it's uncontested that the stop lamps operated by the pulse modules stay within this range. The pulse provided by the module dims and brightens the lamps within this range. It's a perceptible change, but it's a narrow one that's allowed by the rule. Second, the rule describes lamps as either steady burning or flashing. These phrases are used about 200 times in the rule, often in direct contrast to one another. So you'll see, for example, a common formula, steady burning, except it may be flashed for signaling purposes, for example, a side marker. Although steady burning is not defined, a flash is defined as a cycle of activation and deactivation of a lamp, turning the light on and off. The structural inference from that juxtaposition is that a light that is steady burning, if it is within the range and does not flash. And that's not a structural inference that only we've drawn. It's also one that the agency has drawn. And so you see that in the 98 letter that I quoted earlier. It's also in the 99 shepherd letter that they forwarded to our clients, which says, in our opinion, the regulation is straightforward and clear. Standard 108 lists the lamps which are permitted to flash. Stop lamps are not among them. Installation of a device that causes the high-mounted stop lamp to flash would create a non-compliance issue. It's also the 2019 Shea letter, which we cite in the papers. We've determined that your product would likely be considered steady burning because the event that triggers the activation of the LEDs is likely not something that occurs so frequently or randomly that would cause your product to appear to flash. Interestingly, they said there, we acknowledge that this interpretation supersedes some of our prior, more restrictive interpretations of the concept of impairment. So to the extent the agency has been on both sides of this issue about what steady burning means, they said in 2019, we're superseding our earlier letters and it means a light that does not flash. And third, I would just say there's nothing else in Standard 108 that could objectively determine when a lamp is steady burning. And that's a problem for NHTSA. The agency concedes in its letters and in its briefs that some variation is permitted in a steady burning lamp. If that's true, the question is how much? And under the statute, the answer has to be objective and measurable. The only things we have like that in the rule are the definition of flash and the photometric requirements. If those don't define steady burning, then the rule violates the statute because the statute says it has to be objective. And at minimum, the adjudications would be arbitrary and capricious because the agency has not said what it thinks steady burning actually means. Only they've said, we don't think it's your device. They say we're wrong to look at flash and photometrics. The only two things in their rule. But they haven't told us what we should look at. The adjudications are also arbitrary because they're not reasonably explained. They say pulsing is not steady burning, but they don't explain that position despite the company having presented its arguments in detailed letters. That's arbitrary not to provide a reasonable response to an argument. And third, we think it departs from precedent as I outlined a moment ago. You're clear, both parties are clear that a consumer can just do this, right? Can the consumer take it to this dealer that can't sell it to them and have the dealer put it on for them? No, the dealer cannot install it. They can't have any connection with it at all. Can the dealer recommend it under their view? You may have to ask them. I'm not sure about that. I'd like to reserve the remainder of my time. Thank you, Your Honor. Case in Ross for the Department of Transportation. Plaintiffs' aftermarket devices cause a motor vehicle's brake lights to dim and brighten, or pulse, rather than burn at a steady intensity as the motor vehicle safety regulations require. So the federal government sought to inform plaintiffs' customers, mostly car dealerships, that the dealerships could violate the Motor Vehicle Safety Act by installing those devices and causing cars' brake lights to deviate from the regulatory requirements. The only step the government has taken to prospectively inform those dealerships was to ask plaintiffs for their customers' contact information, which plaintiffs have now turned over and they've never actually contested doing so. The letters that the government sent in July 2023 carried no legal consequences, neither for plaintiffs nor for plaintiffs' customers. So when plaintiffs sued purporting to challenge those letters, the district court correctly dismissed the suit for lack of final agency action. Counsel, are you familiar with our decision, Firearms Regulatory Accountability Coalition? Absolutely, Your Honor. Didn't the agency apply the law to the facts in this case? And if so, why aren't there legal consequences that flow from that? Of course. So I was just going to refer to the fact that the plaintiffs' counsel argued that the application of facts to law begets final agency action. And that's not right. Whether an agency applies facts to law is only relevant if that application carries legal consequences. And in Firearms Regulatory Accountability Coalition, that was true for three reasons. First, as the court recognized in that case, the ATF had promulgated a rule that constituted what this court characterized as a sea change in the regulatory environment, sweeping in millions of firearms to be subject to the terms of the National Firearms Act and the Gun Control Act. Second, in doing so, those millions of firearms were now subject to taxation and registration requirements, which are totally different from plaintiffs' devices here. And third, those taxation and regulatory requirements bore real teeth, namely potential felony convictions and a possible lifetime ban on owning a firearm. So you're saying there's no real teeth to telling their customers that they'd be violating federal law if they installed their product? Only in a subsequent enforcement action, Your Honor. Now, the Motor Vehicle Safety Act, and certainly, just to take a step back actually quickly, it certainly bears no consequences for plaintiffs. And the only consequence would adhere to a plaintiff's customers or the car dealerships. And that's by virtue of the terms of the Motor Vehicle Safety Act itself. Counsel, what about the practical fact of ruining their business or making them have to deal with Walmart or something like that? So, Your Honor, those kinds of practical consequences are different from what are legal consequences for purposes of final agency action under the Administrative Procedure Act. The Fourth and Sixth Circuits have made very clear that third parties' independent compliance to seek to adhere to regulatory or statutory requirements are not legal consequences for purposes of the Administrative Procedure Act. You indicated briefly that one of the distinguishing factors about this case was the other case had a sea change. And I had asked your colleague on the other side about why this seemed, from your perspective, the agency's perspective, to be consistent. He made a fairly compelling argument that the agency has not been consistent and that the most recent letters that are at issue in this case are a change in agency position. Would you respond to that? Yeah, that's wrong, Your Honor. Since the early 1970s, the agency has had a consistent position that a perceptible change in a vehicle's brake lights would not be steady burning. Now, the plaintiffs put quite a large weight on the adverb, widely, which is the term used in the 1973 letter. And that, I think, is further elaborated upon in the 2005 and 2020 letters to Mazda and Hyodo, which explains that a perceptible change in a vehicle's brake lights, which I think comports with a common-sense understanding of when you or I see brake lights on the road, would not comply with the steady burning requirement. And so, for example, plaintiffs refer to the 1998 letter to Mr. Goldstein, and in that case, the device at issue was one in which the vehicle's lights or the proposed device would cause the lights to change with the ambient lighting intensity. That is, at any one given time, just as my light here is at a consistent intensity, say there was a huge glare from the sun and Ms. Henderson sought to reduce the intensity of the light so that I would continue to see it, that would still be burning at a steady intensity, and that's what the 1998 letter requires. If this is just a continuation of long-standing agency policy, then what was the purpose of the four-year investigation? Which investigation are you referring to, Your Honor? I'm sorry. The briefs refer to the conclusion of a four-year investigation by the agency which resulted in these letters. I'm not sure I follow. I do know that in 2019, the agency sent very similar letters to Plaintiff Williams and Lake seeking their customers' information, and Plaintiff Williams and Lake turned it over at that time. And then additional letters were sent in 2023, essentially making the same request for information. The agency has taken that under advisement and has continued to consider whether to send letters to plaintiff's customers. You know, just last week, Secretary Duffy issued a letter to a member of Congress indicating that at this time, it is determined that no further communication with the regulated industry is warranted. That is just the agency's prerogative in terms of communicating with regulated industry. But that's something I think that the court should encourage. You know, the FDA sends warning letters regularly to pharmaceutical companies, warning them that their devices or pharmaceuticals might not comply. Might not comply? Does that matter? Because that wasn't the letter that was sent here. No, I think it does matter, Your Honor. Even an FDA warning letter, for example, might not carry legal consequences, just as the letter that the Army Corps of Engineers sent in, excuse my pronunciation, Sisseton-Wapiton Oyate Reservation, essentially communicating a warning to the Indian tribe in that case that taking particular action might not comply with the Clean Water Act. You're using the word might. I'm not aware of any ambiguity or unequivocal position that the agency intended to communicate to their customers. I think it was very, very clear that there's a violation of the law here. I note on page 11 of your brief, you used the phrase, could cause a vehicle's brakes to be noncompliant. And yet, if you look at the language of a letter, I think it's unequivocal. So, even so, Your Honor, that would not cause any legal consequence for plaintiffs. So far as I understand the terms of the Motor Vehicle Safety Act, they couldn't be liable unless one of plaintiffs installed the devices on a motor vehicle, taking it out of compliance with the regulatory requirements. You can say it could have a detrimental effect on the business, but that's not a legal effect. Is that the agency's position? Precisely, Your Honor. What about the Hawks case? Are you familiar with our Hawks case where it talks about substantial costs, restrictions on otherwise lawful conduct? Yes, Your Honor. And we act like those are legal consequences. So, let me finish the question. No, no, just to say, I believe that we think legal consequences, at least if I'm understanding the Hawks case here, and I have a quotation from it, aren't just what we lawyers may think of legal consequences. Go ahead. Sure. So, in that case, the relevant agency action from the Army Corps of Engineers was a determination that certain property constituted quote-unquote waters of the United States. And that determination is a hugely consequential one. In that case, particularly, it would increase enforcement penalties that could have been brought against the Hawks company, and it eliminated the ability for... But the next sentence says penalties are not required. That's true, but it also... The next sentence or two of the Hawks... It also eliminated, Your Honor, the availability of a safe harbor. The point being that the court in Hawks specifically outlined the kinds of things that constitute final agency action. That is, consequences that might flow from an agency's decision that would amount to final agency action. Namely, enforcement penalties, restricting the use of someone's property, or increasing compliance costs, which is exactly what happened in that case because it increased the amount that the company was going to have to pay to go through an expensive permitting process simply by virtue of the determination. Now, none of that is true here. The July 2023 letters, and I think it's worth taking a step back, they only ask for plaintiff's customers' information. That's it. And plaintiffs have already provided that to the agency. Now, the agency has, as Judge Kobus identified, re-articulated a very long-standing understanding of the Standard 108 that brake lights need to be steady burning, but that would not cause any legal liability for plaintiffs themselves. Instead, the agency sought only to collect information on the regulated industry so that it could subsequently inform those car dealerships that they might be violating the Motor Vehicle Safety Act. Now, that subsequent informative step would carry a different legal import than the letters at issue here, but those letters haven't been sent. And in fact, there's nothing stopping the agency from calling any of those car dealerships now, just picking up the phone and saying... You're playing a little bit of a cat-and-mouse game with it, aren't you? Because you've got them, and there's nothing in the record that really, tell me if I'm wrong, that really indicates if and when you're going to send the letters or not send the letters? Is this like the sort of Damocles just dangling over them like that? I don't think so, Your Honor. I will say that the kinds of enforcement actions brought under the Motor Vehicle Safety Act are extremely rare. And that would require a knowing demonstration that one of the car dealerships had sort of gone out of its way to violate the safety regulations. Wouldn't they go out of their way if they ever do it? If they ever put one on, have they gone out of their way? I'm using your term. No, not necessarily. They would have to knowingly do so. Somebody knew when they put it on. I don't know what you're driving at. Sorry, the language of the statute is somewhat hard to... At first blush, it's hard to understand. It's knowingly make operative a component of a motor vehicle to take it out of compliance with the Motor Vehicle Safety Standards. It's like putting them on, but go ahead. Well, I think the agency's understanding is that knowingly make operative a component is that you would have to know that you're actually disabling a component such that it takes it out of compliance with the safety standards. So it was knowledge of the illegality. Correct, exactly. That's the mens rea requirement, as it were. So that is not an easy standard to meet. Of course, if the agency sends a letter, it becomes a very easy standard to meet. But even then, that would not necessarily carry legal consequences for the dealerships at that time. It would have to be in a subsequent enforcement action, which the agency, in fact, cannot take and is subject to the discretion of the Attorney General. So the agency's authority here is actually quite limited. But I think it's just seeking to inform the regulated entities of their obligations under the relevant statutory and regulatory framework. This is a requirement, as Your Honor identified, that has existed for decades and I think is consistent with any motor vehicleists' understanding of cars on the road that brake lights, once they're pressed, are steady burning. By plaintiff's own characterization. Counsel, that's not true. There are millions of these. I've seen some. I hate to tell you that, but I've seen them that do what they're talking about. And I understand that the safety, I don't know whether it's in the record. Yes, it is in the record. You have it in both briefs. The safety people, so that's maybe even safer by the way they work at first. So these are the kinds of questions, I think, Your Honor, that are actually best left to the agency's safety determination to consider whether it would be safer on the roads. Yeah, but how come when you send a letter like this haven't you, in effect, made that decision? Not necessarily. And in fact, the agency continues to consider whether, by conducting research studies, whether these kinds of devices would be safer in the future. That is the sort of data-driven approach that the agency prefers to take. Are those studies ongoing at this point? Yes, they are, Your Honor. And have they been ongoing since Judge Cummings was born? I'm not sure, Your Honor. Because I understand these are common around the world, too. I can tell you with some certainty that the agency regularly considers whether new technological innovation would be appropriate to adjust the relevant safety standards. Now wait, this has been around for decades. This technology has been around for decades, right? The plaintiff's technology, I don't know. Has there ever been an enforcement action under this provision? I'm not sure, Your Honor. The example that the agency has provided to me is that some repair shops for a time were disabling motor vehicles' airbags. And that was an action that the agency determined was probably subject to enforcement, as you might understand. That's not so safe. But in this instance, not as to Standard 108. That is, I don't know of any example in which the agency has brought an enforcement action for brake lights not being steady burning. The letters that are referenced in the parties' briefs I think are very similar to what had plaintiffs reached out to the agency in the first instance to ask the agency whether their devices would comply with Standard 108. And the agency regularly engages in that kind of dialogue with the industry to articulate its understanding of the relevant safety standards in an effort for industry to understand what the regulatory requirements mean. And as they are, I think you would agree, somewhat impenetrable. And that allows new cutting-edge technology to be developed that are consistent with the regulatory standards. The ambient light intensity device that I referred to in the 1998 letter being one of them. That the light could change according to how the ambient light looks so that drivers are still able to understand that the light is burning at the same intensity. So a plaintiff's reference to the photometric range and that their lights stay within the various candelas specified in the regulations is a red herring. I think the district court actually cogently explained that the steady burning requirement in some ways is two-fold. That is, a light has to be burning. Is that a footnote? It is, Your Honor. As you discussed with plaintiff's counsel, the district court didn't actually address the merits because it dismissed for lack of jurisdiction. And I think, as Your Honor correctly identified, the appropriate course were the court to determine that the 2023 letters were final agency actions would be to remand to the district court in the first instance. The balancing of the equitable factors was an important one for the district court as a fact finder to conduct in the first instance. That aside, the district court was simply opining on what the steady burning requirement meant. Just in my brief 10 seconds left, I will urge the court to look at the 2019 letter to Shea in which the agency explained that even a strobe light, for example, would neither be flashing nor steady intensity. So plaintiff's effort to articulate some binary there is actually inconsistent with the regulations themselves. I urge the court to affirm the district court's dismissal. Thank you for the argument, counsel. Just a few points, Your Honor, in the little bit of time I have left. I heard my friend say it's not right that applying law to fact is final agency action. It's our contention that actually explains all the cases involving the letters that some apply law to fact and some don't. This isn't a line that we made up. The D.C. Circuit and Ipsen Biopharmaceuticals said agencies often communicate their interpretations of governing statutory and regulatory obligations or prohibitions to parties and letters and they do so without taking final agency action. In this case, however, the nature of the agency's letter went beyond simply announcing its interpretation of relevant statutory and regulatory language. The letter expressly applied CMS's interpretation of the governing law to the specific facts of Ipsen's case. In that respect, the agency action at issue here closely resembles an individual adjudication which is a well-recognized form of agency action. Counsel, your friend from the other side suggested there's always this back and forth between industry and regulators and, you know, back and forth, how does the agency view this? Here's the product we have. And I think the suggestion was or at least my interpretation of that is if we jump into that process and sometimes it will involve the application of the agency's understanding of the regulation to a particular product that the industry is manufacturing and that that's something that we should encourage and that's why this final agency action rule exists and if we preempt that, that essentially is a bad policy outcome among other things. What's your response to that? Because I can imagine these interactions where you do say, here's my product, here's your regulation does it apply? And the agency says it applies to your product and then that's final agency action even though there's been no enforcement action and there may be further dialogue. What's your response to that? Sorry for the long question. You see letters like that in the case law and those are letters that say things like could, may appears, it might be the agency has concerns language like that that is not final. What about the agency's opinion is it applies to your product? Well if they say that it applies to your product, they have applied law to fact and that's final. Even without an enforcement action then? So that puts an end to the or at least the option of the industry puts an end to the back and forth process. That's what the Supreme Court said in Hawks that's what they said in Bennett, that's what they said in Sackett and each of those cases the government said, well the enforcement action is later so this is not final and each time the Supreme Court said no because this has legal consequence. I see my time is up. No other questions so thank both counsel for the argument. Case number 24-2951 is submitted by for decision by the court.